**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **LARRY R. WIMBERLY,** ) | |
| **and his wife, PAM WIMBERLY,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 2:19-cv-02691-JTF-tmp** |
| **v.** ) | |
| ) | |
| **CAMPBELL CLINIC, P.C.,** ) | |
| **and ASHLEY LEWIS PARK, M.D.,** ) | |
| ) | |
| **Defendants.** ) | |

**ORDER DENYING DEFENDANT'S MOTION TO STRIKE AND DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court are two motions filed by Defendants Campbell Clinic and Dr. Ashley Lewis Park. First is a Motion for Summary Judgment, filed on November 29, 2021. (ECF No. 84.) Plaintiffs Larry and Pam Wimberly filed a Response to the motion on December 27, 2021. (ECF No. 87.) As part of their Response, the Wimberly's included a declaration from their expert witness, Dr. Niteesh Bharara. (ECF No. 87-4.) Defendants then filed the second motion before the court: a Motion to Strike Bharara's Declaration, on January 10, 2022. (ECF No. 88.) Defendants also filed a Reply to the Response to the Motion to Summary Judgment on that same day, as well as a Response to Plaintiffs' Statement of Additional Material Facts. (ECF Nos. 89 & 90.) Plaintiffs filed their Response to the Motion to Strike on January 19, 2022. (ECF No. 91.) Defendants filed a Reply to that Response on February 4, 2022, after receiving leave of the Court to do so. (ECF Nos. 94 & 96.)

For the following reasons, the Court finds that both motions should be **DENIED**.

## I.   **FACTUAL AND PROCEDURAL HISTORY**

1. *Factual Background*

On August 1, 2018, Defendant Dr. Ashley Park performed a lumbar epidural steroid injection on Larry Wimberly, without complication and within the normal standard of care. (ECF No. 87-5, 2.) Park worked and performed the procedure at Defendant Campbell Clinic. At the time, Wimberly was taking a therapeutic anticoagulant medication. (ECF No. 90, 4.) In the days following the injection, Wimberly began experiencing pain in his leg, numbness in his genitals and rectum, constipation, and difficulty urinating. (ECF No. 87-5, 2.) On August 10, Wimberly called Dr. Park's assistant, Erica Pilgram, at Campbell Clinic. (ECF No. 90, 2.) Defendants and Plaintiffs dispute what exactly Wimberly complained of during this call, but it is undisputed that Pilgram informed Park of the call and that Park prescribed Gabapentin to Wimberly. (ECF No. 90, 3.) Wimberly continued to have difficulty walking after August 10 and later fell in his home. (*Id.* at 8.) He testified that the pain got gradually worse every day. (ECF No. 87-3, 6.) Wimberly called again on August 13 to report the fall and that the pain was increasing, and testified that Pilgram told him to stop taking the Gabapentin if it was making him fall. (*Id.* at 12.)

Also on August 13, Wimberly went to an appointment at Stern Cardiovascular for an unrelated issue. (*Id.*) Wimberly called Campbell Clinic again on August 23, complaining again of leg pain, as well as back pain. (ECF No. 90, 9.) This time, Pilgram told him to come in. (*Id.*) Once at Campbell Clinic, Wimberly was given an MRI, which showed that he "had developed an epidural hematoma from L3 to S1 that was compressing his spinal cord, and Mr. Wimberly was diagnosed with cauda equina syndrome." (*Id.* at 10.) Park then sent Wimberly to the emergency department at Baptist Memorial Hospital – Collierville for emergency surgery to evacuate the hematoma. (ECF No. 87-5, 2.) After this surgery, Wimberly contends that he "continues to suffer

2

from numbness in his legs, toes, anus, penis, and testicles and has difficulty defecating and urinating." (ECF No. 90, 10.) Wimberly also developed an abdominal hernia that required surgical repair. (*Id.* at 11.)

On October 10, 2019, Wimberly filed suit against Park and Campbell Clinic, contending that they had breached the standard of care regarding his treatment after the epidural injection and were thus liable for the damages he has continued to suffer after the evacuative surgery. (ECF No. 1.)

### 2. *Dr. Niteesh Bharara's Testimony*

The present summary judgment motion concerns the disputed adequacy of one expert witness's testimony to establish the necessary causation element of Wimberly's claim. That testimony must thus be discussed in detail.

As part of the present suit, Wimberly presented one signed expert report from one witness, Dr. Niteesh Bharara. (ECF No. 87-5, 3.) Bharara was deposed on June 2, 2021 and was questioned extensively about his report and the case generally. (*Id.* at 4.) Bharara testified that after the epidural injection on August 1, Wimberly developed a slow bleed at the injection site. (*Id.*) In Bharara's opinion, the procedure was performed adequately. (*Id.*) Bleeds developing into epidural hematoma's are a known, common complication from epidural injections. (*Id.*) However, Bharara opines in his expert report that Park and Campbell Clinic breached the normal standard of care at two points. First, Bharara states that Pilgram failed to adequately triage Wimberly during his August 10 call and did not provide Park with the necessary information to treat Wimberly at that point. (*Id.* at 5.) Second, Bharara is critical of Park failing to bring Wimberly back to Campbell Clinic at any point between August 10 and August 23 to evaluate the symptoms he complained of in his calls to the clinic, which Bharara believes resulted in a delayed diagnoses of the epidural

hematoma and Wimberly's subsequent development of cauda equina syndrome.[1] (*Id.* at 6.) Bharara stated that these deviations from the standard of care caused injury. (*Id.*)

Bharara explained that cauda equina syndrome occurs when a hematoma becomes large enough that it begins to compress the spinal cord. (*Id.* at 10.) Bharara believes that it is likely Wimberly developed cauda equina syndrome sometime in the week of August 15 – August 23. (*Id.*) In his report, Bharara stated the following regarding causation:

> It is my opinion that the failures of care by Dr. Park and his doctor assistant, singularly and in combination, caused injuries and damages to Mr. Wimberly that would not have otherwise occurred. Mr. Wimberly developed a bleed in the site of the nerve block after the procedure. That bleed developed into a hematoma, or a pocket of blood. When the hematoma became large enough that it began to compress on Mr. Wimberly's spinal cord, it is known as cauda equina syndrome. The point when the spinal cord is compressed is when the situation becomes an emergency, because cauda equina syndrome often leads to permanent injuries to a patient. If a hematoma can be evacuated before it compresses a patient's spinal cord, it is far less likely that there will be lingering adverse effects.
>
> It is my opinion that the cauda equina syndrome developed sometime in the week prior to Mr. Wimberly presenting to Campbell Clinic on August 23, 2018. Dr. Sneed saw Mr. Wimberly on August 13, 2018 and did not determine the situation to be an emergency at that time. Mr. Wimberly has stated that it was around August 15, 2018 when he required a wheelchair or a cane full time to get around. Therefore, it is more likely than not that cord compression did not begin until the week prior to August 23, 2018. If Dr. Park had re-evaluated and assessed Mr. Wimberly when he called on August 10, 13, or 16, it is more likely than not that the hematoma could have been diagnosed and evacuated before the development of cauda equina syndrome. If that had occurred, it is likely that Mr. Wimberly would have experienced a reasonably short recovery period and returned to his usual abilities without lingering effects.
>
> It is my opinion that Mr. Wimberly's pain, weakness, numbness, fatigue, hernia, bowel and bladder issues, and difficulty ambulating are a direct result of the defendants' failures of care. Mr. Wimberly would have required hospitalization and likely surgical evacuation regardless of when the hematoma was diagnosed, so the hospitalization on August 23, 2018 at Baptist Memorial Hospital-Collierville was not necessitated by delay in diagnosis. However, the hospitalizations at Baptist

---

[1] Plaintiffs contend that Bharara testified to a third criticism, involving the delay in diagnosis of the hematoma and/or cauda equina syndrome, but this appears to the Court as merely semantic. (ECF No. 87-5, 5.) Sometimes, Bharara testified to the delay in diagnosis as a deviation part and parcel with Park's alleged failure to bring Wimberly back in, and sometimes testified to the delay as a separate deviation. Either way, it was well accounted for in his testimony.

> Memorial Hospital-DeSoto on May 28, 2019, August 22, 2019, August 26, 2019, and September 5, 2019 were necessary as a result of the defendants' failures of care. Further, the treatment and services rendered by The Urology Group and Gastro One since 2018 were necessary because of the delay in diagnosis.

(ECF No. 84-5, 5-6.)

In his deposition, Bharara was asked about what he viewed as the deviations from the standard of care in Wimberly's case. He stated:

> I believe that the deviation of care initially would be that the medical assistant did not provide or didn't triage the patient adequately, and didn't provide Dr. Park with an adequate amount of information . . . Number two, the patient was never brought in and evaluated for a new symptom. With that being said, there is -- the patient was not brought in, it makes it very challenging for a diagnosis to be made of cauda equina or epidermal hematoma. And so there was a delay of the diagnosis because of that.

(ECF No. 84-3, 3-4.) When asked what the basis was for his opinion that there was a delay in diagnosis of the hematoma and/or cauda equina, Bharara stated:

> Well, if the patient was brought in in a timely manner, then many of the signs and symptoms would have been seen at that point in time. You look for, there's many things you can look for. Certain symptoms that you look for. And if that was seen earlier, cauda equina or at least the beginnings of cauda equina or epidermal hematoma would be known. . . . would be known or evaluated or diagnosed.

(*Id.* at 6.) Bharara also confirmed that he believed Wimberly should have been called into the Clinic and evaluated on August 10. (*Id.* at 7.)

When asked whether "the hematoma and/or cauda equina would have been diagnosed" if Wimberly had been brought in on August 10, the following exchange took place:

> Bharara: Diagnosed at that time? Well, what I said was, the patient was evaluated and looked for signs and symptoms of potential progression to cauda equina syndrome. But at that point in time, he was complaining of increased pain after a procedure. You're very concerned about a potential epidermal hematoma with increase in pain and other neurologic signs and symptoms.
>
> Counsel: Are you going to testify to the ladies and gentlemen of the jury that if Mr. Wimberly had been brought back in by Dr. Park on August 10th, 2018, that the hematoma would have been diagnosed?

> Bharara: I think there would have been signs and symptoms and they would have been evaluated at that time. Unfortunately, there was no evaluation at that point in time, so I don't know exactly what the patient was presenting with. So I wouldn't know if the actual diagnosis could have been made. But I know at that point in time the signs and symptoms that would be complained about would have concerned me about an epidermal hematoma.
>
> Counsel: What signs and symptoms are you talking about?
>
> Bharara: Increased pain after a procedure. Especially in the legs. Weakness, numbness.

(*Id.* at 7-8.) When asked whether Park would have ordered an MRI after observing such symptoms on August 10, Bharara responded that "[i]f I see weakness after an epidural in a patient that had anticoagulation, I would be very concerned and potentially [would have] ordered an MRI at that time." (*Id.* at 16.)

Bharara later noted that on August 13, "[b]ecause at that point [Wimberly] was complaining of numbness in his legs," the "chances are there was something compressing the cord at that point." (*Id.* at 19.) When asked directly when the spinal cord became compressed, the following exchange took place:

> Bharara: I don't know. Usually when, I mean it happens through the process. It's not that your spinal cord is compressed and you have a medical emergency. If this is the case, it was a slow bleed. So it was gradually getting compressed because the symptoms became numbness and then progressed. So I couldn't tell you when the spinal cord was compressed.
>
> Counsel: Are you going to tell the ladies and gentlemen of the jury any certain dates that if there had been intervention that his outcome could have been prevented?
>
> Bharara: There's no specific date. But one of the things we do know is that early intervention is the best intervention when it comes to cauda equina syndrome. The longer the blood is present, then the more compression force to the nerve roots, the more -- the more the prognosis. [sic]
>
> Counsel: And I think I understand what you're saying. But I just want to make certain I understand. You're not going to tell the ladies and gentlemen of the jury that if intervention had occurred on the 12th or the 13th, that the outcome could have been prevented? [Opposing Counsel Objected to Form]. And I'm talking

about, I understand the earlier the better. But you're not going to say if by X date there had been intervention, he wouldn't have had the same outcome?

Bharara: No.

(ECF No. 84-3, 18-19.) Bharara was then asked about the following portion of his report:

Counsel: You state in your causation opinions: [. . .]  If a hematoma can be evacuated before it compresses a patient's spinal cord, it is far less likely that there will be lingering adverse effects.

Bharara: Yes.

Counsel: In your opinion, when should this have been done in Mr. Wimberly's case?

Bharara: As early as possible.

Counsel: If it had been done when Dr. Sneed saw the patient on the 13th, would that have prevented the outcome?

Bharara: Depends on how big the hematoma was at that point in time. Depends on how much compression of the hematoma was there. I don't know. I don't have an image of it. He had cited the symptoms of it already. I don't know if the signs and symptoms were of true cauda equina syndrome. So I don't know the answer to that question.

Counsel: So potentially, yes. If it had been addressed on the 13th, could it have made a difference in his outcome?

Bharara: Yes. The earlier you do it, the better it is. So if it was the 13th instead of the 23rd, absolutely. If it was the 10th instead of the 13th, absolutely. If it was before that, even better.

(*Id.* at 20-21.) Discussion then moved to the timeline regarding Wimberly's worsening condition:

Counsel: You go on to state that it is more likely than not that cord compression did not begin until the week prior to August 23rd, 2018; what is the basis for that opinion?

Bharara: Well, he got significantly worse at that time. And he couldn't ambulate. Things got significantly worse. So at that point in time he has got true cauda equina symptoms based on his deposition.

Counsel: And you would be talking about the week before being August 15th?

Bharara: Yeah. Because I believe on August 13th, he was just complaining of bilateral numbness in his legs from Dr. Sneed's medical records.

(*Id.* at 22-23.)

Finally, Bharara was asked about the sections of his opinion relating to the effect the delay

in diagnosis and treatment may have had on his long term outcomes:

> Counsel: You state that if the hematoma had been diagnosed and evacuated before development of cauda equina, he would have, Mr. Wimberly, could have experienced a reasonably short recovery period?
>
> Bharara: Yes
>
> Counsel: What's the basis for that opinion?
>
> Bharara: If you get it before the cauda equina is completely compressed, you have a much better prognosis of recovery. It was kind of what I mentioned before. The quicker you're able to evacuate it, the less symptoms you're going to have, the easier recovery, better prognosis. The longer you wait, the more challenging it will be.

(ECF No. 84-3, 23.) Eventually, the questions became more specific:

> Counsel: Do you believe if an MRI had been ordered on August 13, 2018, after Mr. Wimberly complained of that numbness to Dr. Sneed, that the hematoma would have been diagnosed?
>
> Bharara: Depends on how big. Depends on how much blood was in the epidural space. So if an MRI was ordered, we would have seen the blood in the epidural space.
>
> Counsel: On the 13th?
>
> Bharara: Yes. [. . .]
>
> Counsel: If Mr. Wimberly had sought treatment on August 14, 15, 16, 17, 18, 19, 20, 21, or 22, could his outcome have been altered or prevented based upon a reasonable degree of medical certainty?
>
> Bharara: I don't know if his course could have been altered or prevented. I think you would still need to evacuate the hematoma.
>
> Counsel: But you can't say based upon a reasonable degree of medical certainty whether it would make a difference?
>
> Bharara: I can tell you that the earlier you evacuate a hematoma, the less long-term complications you have. So the earlier you evacuate the hematoma, the less signs and symptoms -- he would have had a better prognosis to improve.

Counsel: Could he have had the same outcome if the hematoma had been evacuated on the 13th, 14th, 15th?

Bharara: If the symptoms that were described on the 13th, that he was ambulating at that point. So if it would have been evacuated earlier on, he would have had less long-term side effects.

Counsel: Could you say if it would have been evacuated on the 20th if he would have had the same outcome?

Bharara: I don't know how he was feeling on the 20th. And I don't know what his signs and symptoms are. I can just give you the data points that I'm aware of. But I do know, I mean, we know that earlier evacuation would have been better for him. If it was evacuated, you know, day 1 versus day 20, we know that would have been a better prognosis. He would have done better. But I can't tell you if it was 20 versus 19 whether it would have made a large difference. I know prognostically, if you look at the data, it would make a difference. But I don't know in his situation, if specifically whether one day or one minute would have made a difference.

(ECF No. 84-3, 25-27.) This was the last of Bharara's testimony on the relevant matters.

   3. _Bharara's Declaration and the Court's Scheduling Order_

The Defendants' arguments regarding the Motion to Strike involve the Court's Scheduling Order and a challenged declaration submitted by Bharara as an exhibit to the Plaintiffs' Response to the Motion to Summary Judgment. Both are summarized below.

The Court's Scheduling Order stated that all discovery in the present case was to be completed by October 29, 2021. (ECF No. 73.) This date was also chosen as the deadline for all expert witness disclosures. (_Id._) Supplementation of those expert witness disclosures was due by November 15, 2021. (_Id._) Bharara's declaration was filed concurrent with Plaintiffs' Response on December 27, 2021. (ECF No. 87.) Bharara's declaration contains the following relevant statements, in Paragraphs 9-14:

9. It is more likely than not that cord compression did not begin until the week prior to August 23, 2018. If Dr. Park had re-evaluated and assessed Mr. Wimberly when he called on August 10, 13, or 16, it is more likely than not that the hematoma could have been diagnosed and evacuated before the development of cauda equina syndrome. If that had occurred, it is likely that Mr. Wimberly would have

experienced a reasonably short recovery period and returned to his usual abilities without lingering effects.

10. It is my opinion that Mr. Wimberly's pain, weakness, numbness, fatigue, hernia, bowel and bladder issues, and difficulty ambulating are a direct result of the defendants' failures of care.

11. The hospitalizations at Baptist Memorial-DeSoto on May 28, 2019, August 22, 2019, August 26, 2019, and September 5, 2019 were necessary as a result of Defendants' failures of care.

12. The treatment and services rendered by The Urology Group and Gastro One since 2018 were necessary because of Defendants' delay in diagnosis.

13. It is my opinion that Defendants' failure of care caused significant injuries to Mr. Wimberly, including cauda equina syndrome.

14. It is my opinion that Defendants' delay in diagnosis and treatment caused injuries and damages to Mr. Wimberly that would not have otherwise occurred.

(ECF No. 87-4, 3-4.)

## II.   LEGAL STANDARD

### 1. *Motion to Strike*

The parties dispute which legal standard applies to the claims in the Motion to Strike. Defendants state that Federal Rule of Civil Procedure 6 bars Bharara's declaration from being considered, as the Plaintiffs filed the declaration past the Scheduling Order's deadline for supplementing expert opinions without seeking leave of the court. Federal Rule of Civil Procedure 6 sets standard procedures regarding time for motion papers, and states that the court may extend time after it has expired only "on motion . . . if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). When determining whether delay was due to excusable neglect, courts must consider five factors: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5)

whether the late-filing party acted in good faith." *Howard v. Nationwide Prop. And Cas. Ins. Co.*, 305 F. App'x 265, 266-67 (6th Cir. 2009).

Plaintiffs disagree that Rule 6 is the appropriate standard, and instead argue the court must determine "whether Plaintiffs seek to create a factual issue by filing an affidavit which directly contradicts Dr. Bharara's earlier deposition testimony." (ECF No. 91, 3.) This rule, often called the "sham affidavit rule," prevents a party from creating a genuine dispute of material fact at summary judgment by submitting an affidavit that conflicts with the same party's earlier testimony about the same fact. *France v. Lucas*, 836 F.3d 612, 622-24 (6th Cir. 2016). Applying the rule involves a two-step analysis. The court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). If there is no "direct contradiction," the rule "can also apply when the witness's affidavit is in tension with that prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture a 'sham fact issue.'" *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (citing *Aerel*, F.3d at 908). The Sixth Circuit has previously listed factors for courts to consider when deciding whether an affidavit was filed to manufacture a sham fact issue, including "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Aerel*, 448 F.3d at 908-09 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

2.   *Motion for Summary Judgment*

Summary Judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when, viewing the evidence in the light most favorable to the non-moving party and construing all inferences in their favor, there is sufficient evidence for a trier of fact to find for the non-movant. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). The movant may properly support a motion for summary judgment by relying on the record and any supporting affidavits to show a lack of "genuine dispute[s], or that an adverse party cannot produce admissible evidence to support [a] fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).

Conversely, a genuine dispute of a material fact will allow the non-movant to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, (1986). The non-movant cannot rely solely on the pleadings in opposing the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The evidence must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant, as the party with the burden of proof at trial, must support claims with concrete and corporeal evidence. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989). The district court does not have the duty to search the record for such evidence. *See* Fed. R. Civ. P. 56(c)(3); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Additionally, "a nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). If the evidence presented cannot "reasonably support a jury verdict in favor of the nonmoving party, the motion for summary judgment will be granted." *Id.*

### III.   LEGAL ANALYSIS

*1. Motion to Strike*

As a preliminary matter, the Court will consider Defendant's Motion to Strike before discussing the Motion for Summary Judgment.

The Court finds that the submission of the affidavit did not violate the Court's Scheduling Order. Federal Rule of Civil Procedure 56 clearly contemplates that summary judgment practice on both sides will be supported by affidavits and declarations prepared specifically for those motions, and only requires that they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Wilson v. Budco*, 762 F. Supp. 2d 1047, 1057 (E.D. Mich. 2011). Defendants argue that Bharara's declaration improperly supplemented his expert opinion, but the declaration is largely a word-for-word restatement of different portions of his expert report, which had already been submitted to Defendants and is properly before the Court. Defendants argue that this argument is misplaced, since "courts have recognized that 'anticipated testimony is not the same as substantive evidence in the form of a sworn declaration[.]'" (ECF No. 88-1, 4) (quoting *EEOC v. Dolgencorp, LLC*, 196 F. Supp. 3d 783, 795 (E.D. Tenn. 2016)). This is true, but the testimony here was not "anticipated;" it was already given and forecasted in both Bharara's expert report and his deposition. The declaration is not a supplementation.

The Court also finds that Bharara's deposition does not violate the sham affidavit rule. Defendants point to two areas where they believe the declaration contradicts his prior testimony. First, they argue that Bharara testified that he "cannot specify a date that intervention would have prevented Mr. Wimberly's diagnosis of cauda equina syndrome and the resulting injuries alleged

to have been suffered." (ECF No. 96, 5.) But Bharara's declaration never claims to do this: instead, as shown above, the declaration provides a *range* of dates prior to August 23 when "it is more likely than not that the hematoma could have been diagnosed and evacuated before the development of cauda equina syndrome," which is largely consistent with his deposition testimony and at worst clarifies the interaction of disparate responses. *Compare* (ECF No. 87-4, 3) *with* (ECF No. 84-3, 26-27) (Q: "Could he have had the same outcome if the hematoma had been evacuated on the 13th, 14th, 15th?" A: "If the symptoms that were described on the 13th, that he was ambulating at that point. So if it would have been evacuated earlier on, he would have had less long-term side effects."); *accord* (ECF No. 84-3, 23) (Q: "You state that if the hematoma had been diagnosed and evacuated before development of cauda equine, he would have, Mr. Wimberly, could have experienced a reasonably short recovery period?" A: "Yes.") Second, Defendants note that "Dr. Bharara could not testify that Mr. Wimberly's injuries, in whole or in part, would have been prevented if Dr. Park intervened prior to Mr. Wimberly's evacuation surgery on August 23, 2018." (ECF No. 96, 5.) But again, Bharara's testimony noted that an earlier evacuation surgery would have led to a reasonably short recovery period, (ECF No. 84-3, 23), stated he believes Park should have called Wimberly in at an earlier point, and believes there were signs of a hematoma that "would have been evaluated at that time . . . that would have concerned [him] about an epidermal hematoma," (*Id.* at 8). The declaration, at worst, is clarifying "confusion" in Bharara's testimony with opinions already contained, often verbatim, in his prior expert report. *Franks*, 796 F.2d at 1237. This prior presentation is important: Defendants had ample opportunity to question Bharara on these opinions during his deposition and did in fact do so. Given the prior presentation of these opinions in the expert report, Defendant's argument ends up largely paralleling their Motion for Summary Judgment and alleging that Bharara's testimony

14

did not adequately support his opinions regarding causation. That issue is considered and addressed below. But Bharara's testimony never directly contradicted his report or his declaration, and the *Franks* factors do not suggest that the Plaintiffs are attempting to create a sham fact issue.

While this affidavit, made by an expert, was filed after the close of expert disclosures, it did not seek to supplement his expert opinion in violation of the Court's Scheduling Order. Further, there is no evidence that its submission violated the sham affidavit rule. Accordingly, the Motion to Strike is **DENIED**.

*2. Motion for Summary Judgment*

As noted above, Summary Judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact;" even when the Court views the facts and draws all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Material facts are those that would "have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

The relevant cause of action here is a healthcare liability action under Tennessee law. This cause of action is contained at Tennessee Code Annotated § 29-26-115 and requires a plaintiff to establish three elements to recover:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

*See also Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011). The first two elements are not at issue here. The Defendants contend that the Plaintiffs have not established a genuine issue of material fact regarding the third element, referred to as "causation." (ECF No. 84-1, 3.)

"Summary judgement may be appropriate on the issue of causation 'if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion.'" *Bridges v. Lancaster*, No. M2019-00352-COA-R3-CV, 2019 WL 7209602, at *7 (Tenn. Ct. App. Dec. 27, 2019) (quoting *Harvey v. Shelby Cnty.*, No. W2018-01747-COA-R3-CV, 2019 WL 3854297, at *7 (Tenn. Ct. App. Aug. 16, 2019)). Causation has two elements: proximate cause and cause-in-fact. Cause-in-fact "means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (citing *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534, 543 (Tenn. Ct. App. 1981)). To satisfy the cause-in-fact element, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Norris v. East Tenn. Children's Hosp.*, 195 S.W.3d 78, 86 (Tenn. Ct. App. 2005) (citing *Kilpatrick*, 868 S.W.2d at 602). "Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty." *Taylor ex rel. Gneiwek v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 231 S.W.3d 361, 375 (Tenn. Ct. App. 2006) (quoting *Kilpatrick*, 868 S.W.2d at 602). Once cause in fact is established, proximate cause, or whether legal liability should be imposed for the conduct, is considered. *Kilpatrick*, 868 S.W.2d at 598 (citing *McKellips v. Saint*

16

*Francis Hosp.*, 741 P.2d 467 (Okla. 1987)). Causation, like the other elements of a healthcare liability action, must be proven by expert testimony. *Payne v. Caldwell*, 796 S.W.2d 142, 142-43 (Tenn. 1990).

The Defendants argue that Bharara's testimony failed to raise a genuine issue of material fact regarding causation, and instead is "limited to a 'loss of chance' theory."[2] (ECF No. 84-1, 14.) In support of this, Defendants point to Bharara's inability to testify "more likely than not, that Mr. Wimberly would not have suffered the same outcome had Dr. Park intervened on August 10, 2018 or any date thereafter." (*Id.*) They cite to Bharara's testimony that "he cannot specify a certain date that intervention would have prevented Mr. Wimberly's diagnosis of cauda equina syndrome and resultant injuries" and his failure to "opine as to the extent that Mr. Wimberly's injuries would have been prevented if Dr. Park intervened prior to August 23, 2018." (*Id.*) Their argument rests heavily on the Tennessee Court of Appeals opinion in *Taylor ex rel. Gneiwek v. Jackson-Madison County General Hospital District*, wherein the court found that the plaintiff's expert had only testified as to a potential loss of chance, rather than true causation, based "particularly" on the following exchange:

> Q: Okay. Do you have an opinion based upon a reasonable degree of medical certainty whether or not if Mr. Taylor had been intubated at 16:58 or 4:58 versus when he was intubated almost 14 minutes later at 5:12 p.m., whether or not that would have made a difference in the outcome of this case?
>
> A: I don't think any expert can say absolutely one way or the other. *The only way I can answer that question is that the sooner he was intubated, the sooner he got the Epinephrin, the greater his chance of resolving the issue and having a normal life.*

---

[2] "Loss of chance" is a legal theory of causation that allows plaintiffs to recover damages for "the destruction of a lost opportunity for survival or recovery . . . even if the plaintiff's chance of avoiding the ultimate harm was improbable, i.e., less than 50 percent." *Kilpatrick*, 868 S.W.2d at 600. The Tennessee Supreme Court rejected loss of chance as a viable theory of recovery under Tennessee law in *Kilpatrick*. *Id.* at 603-04.

231 S.W.3d at 378-79 (emphasis in original). Plaintiffs disagree, contending that Bharara's testimony adequately established causation and that Defendants' argument overstates the specificity required at the summary judgment stage. Upon review of the record, including Bharara's report and testimony, and drawing all reasonable inferences in favor of the Plaintiffs, the Court finds that the Plaintiffs have demonstrated that there are genuine issues of material fact regarding causation.

The Court notes that Bharara's expert report unequivocally states that "the failures of care by Dr. Park and his doctor assistant, singularly and in combination, caused injuries and damages to Mr. Wimberly that would not have otherwise occurred." (ECF No. 84-5, 6.) Bharara repeats this conclusion in his declaration. (ECF No. 87-4, 3.) Defendants focus more on Bharara's testimony, which they allege betrays that these opinions are unsupported. In particular, they emphasize Bharara's statement that he cannot say that "if by X date there had been intervention, [Wimberly] wouldn't have had the same outcome[,]" as well as his statement that he did not "know in [Wimberly's] situation, if specifically whether one day or one minute would have made a difference" and did not know if evacuation on August 13 would have prevented Wimberly's outcome. (ECF No. 84-1, 11-13.) However, this takes too narrow a view of Bharara's testimony and ignores his other statements regarding the effects that earlier intervention in Wimberly's case may have had.

For example, Bharara testified that if Wimberly's hematoma had "been evacuated earlier on, he *would* have had less long-term side effects." (*Id.*) (emphasis added). At a separate point, Bharara testified that if the evacuation was done on August 13 rather than August 23, it "absolutely" would have made a difference in Wimberly's outcome. (ECF No. 87-2, 22.) He agreed that "it is far less likely that there will be lingering adverse effects" if a hematoma is

evacuated before it compresses a patient's spinal cord, (*id.* at 21), and later agreed that he believed "it is more likely than not that cord compression did not begin" for Wimberly until the week of August 15, (*id.* at 23), which is after he believes Park should have brought Wimberly back in for an examination, (*id.* at 17.) The causal chain goes further, as Bharara also testified that an examination at that point would have concerned him about a hematoma and that he potentially would have ordered an MRI, which would have shown blood in the relevant space. (*Id.* at 17-18.) Defendants draw attention to Bharara's refusal to specify the exact date when intervention would have prevented Wimberly's outcome, but do not justify why Bharara would need to provide such an opinion. Bharara testified that intervening earlier, perhaps by August 13, would absolutely have reduced Wimberly's current, alleged, negative complications. His testimony is consistent with his belief that earlier intervention would have lessened or prevented Wimberly's outcomes so long as the hematoma was evacuated, and that Park should have intervened.

The present case and testimony are different than that in *Taylor*.  In *Taylor*, the plaintiff's expert testified that he did not, or even could not, have an opinion on whether the argued-for intervention "could have made a difference in the outcome of th[e] case." 231 S.W.3d at 378-79. Instead, the expert merely stated that the sooner the patient was treated, "the greater his chance of resolving the issue and having a normal life." *Id.* Of course, this is superficially similar to Bharara's testimony, but distinct in an important way. When asked substantially the same question, as to whether earlier intervention could have made a difference in the outcome, Bharara stated that it "absolutely" could have. (ECF No. 87-2, 22.) Similarly, when Bharara was asked if evacuating the hematoma "on the 13th, 14th, [or] 15th" would have avoided Wimberly's same outcome, Bharara stated that "[Wimberly] would have had less long-term side effects." (ECF No. 84-3, 27.) The difference between the expert in *Taylor* and Bharara is that the expert in *Taylor*

testified that the patient there suffered from a reduction in the chance of avoiding his specific outcome, while Bharara has testified that he believes Wimberly's outcome would have been changed for the better had there been earlier intervention, even if he cannot say precisely how much better it would have been. The confusion comes from some of Bharara's other testimony, which seems to reflect his belief that he cannot say whether Wimberly could have avoided *all* negative outcomes.[3] But Wimberly's case is not dependent on whether he could have avoided negative outcomes entirely if Park had intervened, it is dependent on whether Park's alleged negligence caused the outcomes he actually experienced. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 232 (Tenn. Ct. App. 1999) ("A plaintiff in a medical malpractice action must prove that he or she suffered injuries that would not have otherwise occurred as a result of the defendant's

---

[3] Alternatively, Bharara's testimony may be confused on the definition of "outcome" at certain points, a term which was not defined on a question-by-question basis during his deposition. For example, Bharara was asked the following question:

> Q: If it had been done when Dr. Sneed saw the patient on the 13th, would that have prevented the outcome?

> A: Depends on how big the hematoma was at that point in time. Depends on how much compression of the hematoma was there. I don't know. I don't have an image of it. He had cited the symptoms of it already. I don't know if the signs and symptoms were of true cauda equina syndrome. So I don't know the answer to that question.

(ECF No. 87-2, 26-27.) From this, it seems that Bharara may be considering cauda equina syndrome to be the relevant "outcome," rather than Wimberly's ultimate symptoms and complications. As Bharara earlier stated, "early intervention is the best intervention when it comes to cauda equina syndrome," and thus it is possible Wimberly would inevitably develop cauda equina syndrome based on the facts at hand, but still avoid his ultimate alleged symptoms and complications if it had been addressed earlier. (ECF No. 86, 19.) Similarly, at one point Bharara was asked if Wimberly's outcome could have been altered or prevented if he had sought treatment on August 14, 15, 16, 17, 18, 19, 20, 21, or 22. (ECF No. 87-2, 27.) He replied that he did not know if Wimberly's "*course* could have been altered or prevented" because he believed "you would still need to evacuate the hematoma." (*Id.*) (emphasis added). This again seems to not be referring to Wimberly's ultimate outcomes, but instead whether his course of treatment would have proceeded identically, which would explain the odd reference to the evacuative surgery that Bharara had previously testified was inevitable once the bleed began. *See* (*Id.* at 24-25.) While these interpretations are not outcome determinative, the court is to draw "all reasonable inferences" in favor of the non-movant when assessing a motion for summary judgment. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016); *see also Martin v. Norfolk Southern Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008).

negligent act or omission.") (citing T.C.A. § 29-26-115(a)(3)). Bharara's testimony creates a genuine issue of material fact on this issue.

The Plaintiffs' identification of an extremely similar factual scenario under Tennessee law also supports the Court's finding. In *White v. Vanderbilt University*, a patient suffered from cauda equina syndrome after her doctors failed to diagnose and evacuate a hematoma in time. Her ultimate injuries included "pain and discomfort that interferes with daily activities such as sitting, standing, walking, and sexual relations," as well as bladder problems. *Id.* at 220-21. The *White* plaintiff's single expert's testimony was described as follows:

> Dr. Natelson, the Whites' medical expert, testified that it is more likely than not that the defendants' negligence caused Ms. White to suffer injuries that she would not have otherwise suffered. He also stated that the defendants could have diagnosed and evacuated the hematoma before Ms. White developed cauda equina syndrome and that 'it's more likely than not that the sooner that the blood clot was removed, the better off the patient would end up.' This testimony is sufficient evidence of causation to overcome a directed verdict. Dr. Natelson testified to a reasonable degree of medical certainty that Ms. White suffered damages because of the defendants' negligence.

*Id.* at 232. This testimony is nearly identical to (if not lesser detailed than) Bharara's and involved the same syndrome and similar outcomes. The Tennessee Court of Appeals ordered a new trial for White because "[t]he law does not require the level of specificity and certainty that the defendants advocate, but instead dictates that the plaintiff produce evidence showing that it is more likely than not that the defendant's negligence caused his or her injuries." *Id.* The Court sees no reason to apply Tennessee law differently now.

## IV.   <u>CONCLUSION</u>

For the reasons above, Campbell Clinic's Motion to Strike is **DENIED**, and the Motion for Summary Judgment is **DENIED** as well.

**IT IS SO ORDERED** on this the 16th day of September 2022.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
UNITED STATES DISTRICT JUDGE